SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Hon. Dana L. Redd v. Vance Bowman (A-71/72/73-13) (073567)**

Argued April 28, 2015 -- Decided August 11, 2015

PATTERSON, J., writing for a unanimous Court.

The issue in this appeal is whether an initiative petition filed under the Optional Municipal Charter Law, N.J.S.A. 40:69A-1 to -210, known as the Faulkner Act, requiring the City of Camden to create and maintain its own police force, and enjoining the municipality from replacing its police force with a countywide police force, unlawfully restricts the municipality's legislative authority or is preempted by state fiscal statutes.

Since 1961, the City of Camden has operated under a Mayor-Council form of government under the Faulkner Act, pursuant to N.J.S.A. 40:69A-32. The City of Camden's transition from municipal to county police services followed more than a decade of State oversight of the City's troubled fiscal affairs in a pilot program conducted pursuant to the Municipal Rehabilitation and Economic Recovery Act (MRERA), in conjunction with several statutes governing municipal finance: the Special Municipal Aid Act (SMAA), the Transitional Aid to Localities program (TAL), and the Local Budget Law (LBL).

On August 25, 2011, citing the City's fiscal distress and the need to reduce police-related expenditures, the City of Camden, the County, and the Department of Community Affairs entered into a Memorandum of Understanding in which they agreed to a series of steps leading to the formation of a Camden County Police Department. The countywide police force's Metro Division would replace the services provided by the municipal police department. The Camden City Council approved the immediate implementation of the terms of the August 25, 2011, Memorandum of Understanding in a Resolution dated December 27, 2011.

Defendants, a group of City voters acting as a Committee of Petitioners (Committee), opposed the regionalization of the City's police services. On April 11, 2012, the Committee, invoking the Faulkner Act, submitted an initiative petition for the adoption of a proposed ordinance that would have required the City of Camden to create and maintain "in continued existence" its own police force, enjoining the City from disbanding its municipal police force and replacing it with a regionalized or countywide police force. The Committee obtained, on its petition, the number of voter signatures required by the Faulkner Act. It sought to have its initiated ordinance certified by the municipal clerk, considered by the City Council, and, if not enacted by the Council, placed on the ballot for voter approval in the 2012 General Election.

On May 2, 2012, plaintiffs Mayor Dana L. Redd (Mayor Redd), Camden's Mayor, and Camden's Council President Francisco Moran (Council President Moran) filed a complaint seeking to enjoin the Committee's Faulkner Act initiative. Mayor Redd and Council President Moran argued that the proposed initiated ordinance unlawfully restrained the City's legislative power and that it was preempted by MRERA, SMAA, TAL, LBL, and the Police Force Statute, N.J.S.A. 40A:14-118. On June 12, 2012, the trial court issued an opinion and order prohibiting the municipal clerk from certifying the petition to the Camden City Council, holding that the initiated ordinance would create an undue restraint on future legislation. The trial court rejected the plaintiffs' argument that the ordinance unduly restricted the municipality's exclusive statutory authority under the Police Force Statute. The court, however, did not reach the question whether MRERA or state fiscal statutes preempted the Faulkner Act initiative.

The Committee appealed. While the Committee's appeal was pending, Camden and the County took the final steps to regionalize Camden's police services by formally establishing the Camden County Police Department and disbanding the Camden Police Department. On May 1, 2013, the Camden Metro Division of the County Police Department began providing police services to the City of Camden. It continues to provide those services today.

The Appellate Division reversed the determination of the trial court, holding that the initiated ordinance did

1

not constitute an improper divestment of the municipal governing body's legislative power. 433 N.J. Super. 178 (2013). On the question of preemption, the panel concurred with Mayor Redd and Council President Moran that MRERA and the state fiscal statutes suggested a legislative intent to fully occupy the field of municipal finance in Camden. The Appellate Division remanded the case to the trial court for further consideration of the issue of preemption.

The Supreme Court granted the parties' petitions and cross-petition for certification. 217 N.J. 293 (2014).

**HELD**: The Faulkner Act initiated, proposed ordinance does not constitute an unlawful restraint on the future exercise of the City of Camden's legislative power and is not preempted by the Municipal Rehabilitation and Economic Recovery Act or any of the state's fiscal statutes. However, the ordinance, as drafted, is out of date, inaccurate, and misleading. The challenge to the police reorganization must start anew with an ordinance that reflects the facts as they now stand.

1. Mayor Redd and Council President Moran urge the Court to dismiss the appeal as moot on the ground that Camden has already disbanded its Police Department and has contracted to receive its police services from the County police force. An issue is "moot when our decision sought in a matter, when rendered, can have no practical effect on the existing controversy." Deutsche Bank Nat'l Trust Co. v. Mitchell, 422 N.J. Super. 214, 221-22 (App. Div. 2011). The issue in this case is justiciable; it can and should be resolved by this Court. The remedy sought by Mayor Redd and Council President Moran can still be granted or denied. Consequently, the Court declines to dismiss this appeal as moot. (pp. 15,18)

2. The Court concurs with the Appellate Division that the Committee's Faulkner Act initiative petition does not constitute an unlawful restraint on the Council's future exercise of its legislative power. In the absence of specific authorization from the Legislature, a governing body cannot "divest its successors of legislative power." Redd, supra, 433 N.J. Super. at 188-89. In the Faulkner Act, however, the Legislature has clearly expressed an intent to effect a limited divestment of one aspect of the governing body's legislative power. The Legislature determined that, for a period of three years, an ordinance passed by either initiative or referendum may be amended or repealed only by voter action. By virtue of this short-term constraint, which would temporarily limit the authority of Camden's current and successor legislatures in the event that the Committee's initiated ordinance were adopted, the ordinance would not constitute an improper restraint on future legislative authority. (pp. 18-24)

3. In Overlook Terrace Management Corp. v. Rent Control Board of West New York, 71 N.J. 451, 461-462 (1976), this Court set forth a five-factor test for determining whether a state law preempts a municipal ordinance. In a preemption analysis, the initial question is "whether the field or subject matter in which the ordinance operates, including its effects, is the same as that in which the State has acted." Id. at 461. The preemption standard of Overlook is consistent with the principles stated in two recent opinions in which this Court rejected challenges to referendum petitions submitted pursuant to the Faulkner Act, In re Petition for Referendum on Trenton Ordinance 09-02, 201 N.J. 349 (2010), and In re Referendum Petition to Repeal Ordinance 04-75, 192 N.J. 446 (2007). The Memorandum of Understanding prompting the regionalization of the Camden police force is rooted most directly and specifically in the Municipal Rehabilitation and Economic Recovery Act (MRERA), which reaffirms Camden's status as a Faulkner Act municipality, and by inference, the initiative and referendum procedure at the Act's core. In accordance with the standard set forth in Overlook, and in accord with Ordinance 04-75 and Trenton Ordinance 09-02, the Legislature's intent is clear -- to preserve the Faulkner Act procedures notwithstanding Camden's status as a qualified municipality under MRERA. MRERA does not preempt the power of initiative conferred by the Legislature in the Faulkner Act. Similarly, nothing in the Special Municipal Aid Act, the Transitional Aid to Localities program, the Local Budget Law, or the Police Force Statute precludes the voter initiative and referendum procedures set forth in the Faulkner Act. Accordingly, the Faulkner Act initiated, proposed ordinance at issue here is not invalid by virtue of preemption. (pp. 24-38)

4. Although the Municipal Rehabilitation and Economic Recovery Act does not preempt the Faulkner Act as applied here, it clearly expresses the Legislature's intent that during the "economic recovery term" as defined in N.J.S.A. 52:27BBB-3 and -6, any duly authorized ordinance -- whether passed by vote of the council or presented to the voters by initiative -- is subject to the authority granted to the Commissioner of Community Affairs, and to the Commissioner's veto authority. If an initiated ordinance is submitted to the voters of Camden following the Commissioner's veto, the voters should be informed in an interpretive statement about the Commissioner's veto and

the reasons therefore, including, if applicable, the law enforcement and fiscal consequences that would follow the adoption of the ordinance. (pp. 39-43)

5. Although a Faulkner Act initiated petition challenging the Camden police reorganization is not invalid as a divestment of legislative power or by virtue of preemption, the ordinance at issue in this case may not be submitted to the voters of Camden. By virtue of the disbanding of Camden's municipal police force, the creation of the County Police Department and two years of police services provided to the citizens of Camden by the County Department's Metro Division, the ordinance in this appeal is out of date, inaccurate, and misleading. Submission of the ordinance to the voters, as drafted, would undermine the objectives of the Faulkner Act, which clearly envisions that an initiated ordinance appear on the ballot in precisely the same form in which it was proposed. Nor can the ordinance be salvaged by an interpretative statement, which is intended to explain the question to voters, not to revise it after the fact. Thus, the Committee's challenge to the police reorganization must start anew with an ordinance that reflects the facts as they now stand. (pp. 43-47)

The judgment of the Appellate Division is **AFFIRMED IN PART** and **REVERSED IN PART**. The matter is **REMANDED** to the trial court for the entry of judgment directing the Camden Municipal Clerk not to certify the Committee's ordinance pursuant to N.J.S.A. 40:69A-187.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion. JUSTICE FERNANDEZ-VINA did not participate.**

HONORABLE DANA L. REDD, Camden
City Mayor, and HONORABLE
FRANCISCO MORAN, Camden City
Council President,

    Plaintiffs-Appellants
    and Cross-Respondents,

        v.

VANCE BOWMAN, LARRY GILLIAMS,
EULISIS DELGADO, MARY I. CORTES,
and ROBERT DAVIS, individually and
collectively as the Committee of
Petitioners,

    Defendants-Respondents
    and Cross-Appellants,

        and

LUIS PASTORIZA, Clerk of the City of
Camden, JOSEPH RIPA, Clerk of Camden
County, PHYLLIS PEARL, Camden County
Superintendent of Elections, CAMDEN
COUNTY BOARD OF ELECTIONS, and
CAMDEN CITY COUNCIL,

    Defendants.

        Argued April 28, 2015 – Decided August 11, 2015

        On certification to the Superior Court,
        Appellate Division, whose opinion is
        reported at 433 N.J. Super. 178 (App. Div.
        2013).

        John C. Eastlack, Jr., argued the cause for
        appellant and cross-respondent Honorable
        Dana L. Redd, Camden City Mayor (Weir &
        Partners, attorneys; Mr. Eastlack and Wesley
        L. Fenza, on the briefs).

1

Jay J. Blumberg argued the cause for appellant and cross-respondent Honorable Francisco Moran, Camden City Council President (Blumberg & Wolk, attorneys).

Anthony Valenti argued the cause for respondents and cross-appellants Larry Gilliams, Eulisis Delgado, Mary I. Cortes, and Robert Davis (McDowell, Posternock, Apell & Detrick, attorneys).

Todd A. Wigder, Deputy Attorney General, argued the cause for amicus curiae New Jersey Department of Community Affairs (John J. Hoffman, Acting Attorney General of New Jersey, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel).

Renée W. Steinhagen argued the cause for amicus curiae New Jersey Appleseed Public Interest Law Center.

JUSTICE PATTERSON delivered the opinion of the Court.

This appeal arises from a challenge by initiative to the City of Camden's decision to disband its municipal police department and to contract with Camden County for the delivery of police services to the City of Camden by a countywide police department. The City of Camden's transition from municipal to county police services followed more than a decade of State oversight of the City's fiscal affairs in a pilot program conducted pursuant to the Municipal Rehabilitation and Economic Recovery Act (MRERA), N.J.S.A. 52:27BBB-1 to -79, in conjunction with several statutes governing municipal finance: the Special Municipal Aid Act (SMAA), N.J.S.A. 52:27D-118.24 to -118.31, the

2

Transitional Aid to Localities program (TAL), N.J.S.A. 52:27D-118.42a, and the Local Budget Law (LBL), N.J.S.A. 40A:4-1 to -89. Citing the need to reduce police-related expenditures and increase police presence in the City of Camden, City officials entered an agreement with the State and Camden County to replace the services provided by the municipal police department with those of the countywide police force's Metro Division.

Defendants, a group of City voters acting as a Committee of Petitioners (Committee), attempted to block the regionalization of the City's police services. The Committee invoked the Optional Municipal Charter Law, N.J.S.A. 40:69A-1 to -210, known as the Faulkner Act, which provides for initiative and referendum in accordance with procedures set forth in the statute. The Committee submitted an initiative petition for the adoption of a proposed ordinance that would have required the City of Camden to create and maintain its own police force, and would have enjoined the City from disbanding its municipal police force and replacing it with a regionalized or countywide police force. The Committee obtained, on its petition, the number of voter signatures required by the Faulkner Act. It sought to have its initiated ordinance certified by the municipal clerk, considered by the City Council, and, if not enacted by the Council, placed on the ballot for voter approval in the 2012 General Election.

3

Plaintiffs Mayor Dana L. Redd (Mayor Redd), Camden's Mayor, and Camden's Council President Francisco Moran (Council President Moran) filed a complaint seeking to enjoin the Committee's Faulkner Act initiative. Mayor Redd and Council President Moran argued that the proposed initiated ordinance unlawfully restrained the City's legislative power and that it was preempted by MRERA, SMAA, TAL, LBL, and the Police Force Statute, N.J.S.A. 40A:14-118.

The trial court found that the proposed ordinance constituted an invalid divestment of the City's legislative authority. The Appellate Division reversed the trial court's judgment and remanded for a determination whether the state fiscal statutes preempt the proposed ordinance. Redd v. Bowman, 433 N.J. Super. 178, 198 (2013), certif. granted, 217 N.J. 293 (2014). Before the Committee's appeal was argued in the Appellate Division, Camden's municipal police force was disbanded. Since May 1, 2013, the Camden County Police Department, Metro Division, has provided police services to the City of Camden.

We granted the parties' petitions and cross-petition for certification. Redd, supra, 217 N.J. 293. As a threshold matter, we decline to dismiss this appeal as moot. Although we concur with the Appellate Division that the proposed ordinance does not constitute an improper divestment of the municipal

4

governing body's legislative power, we disagree with the panel's remand of the case for further inquiry into the question of preemption. We find no evidence of a legislative intent to preempt the initiative and referendum procedure set forth in the Faulkner Act in either the municipal finance or police statutes cited in this appeal. Instead, we discern a legislative intent in some of the statutes to retain the Faulkner Act's procedures, including its initiative and referendum provisions. Thus, the Committee's Faulkner Act initiative is not preempted.

However, we note that one component of MRERA, N.J.S.A. 52:27BBB-23(a)(2), affords to the Commissioner of the Department of Community Affairs (Department) a veto power over ordinances passed by the council, subject to override. We hold that any initiative and referendum process affecting Camden's compliance with MRERA must be harmonized with that veto provision, and as such, when the voters consider an ordinance that has been vetoed pursuant to MRERA, they must be informed about the reasons for the Commissioner's veto.

Notwithstanding our holdings that the proposed ordinance neither effected an unlawful divestment of legislative power nor was preempted by state statutes, the relief sought by the Committee in its 2012 petition may not be granted in a manner consistent with the Faulkner Act. The Committee's initiated ordinance would have prevented Camden officials from disbanding

5

the City of Camden's municipal police department and regionalizing its police force in a county department. Because the reorganization that the ordinance was intended to forestall was completed more than two years ago, the ordinance as drafted is inconsistent with current circumstances. Accordingly, the ordinance may no longer be supported by all of the citizens who backed it with their signatures, and it cannot meaningfully be evaluated by the voters. The presence of an out-of-date ordinance on the ballot would contravene the Faulkner Act's objective that voters be presented with a clear, understandable proposed ordinance that they may accept or reject as they see fit.

Accordingly, we affirm in part and reverse in part the judgment of the Appellate Division and remand to the trial court for entry of a judgment barring the Camden Municipal Clerk from certifying the Committee's petition. If the Committee seeks to challenge the Camden police reorganization under the Faulkner Act, it may do so with a new petition and a revised ordinance that reflects the current status of Camden's police services.

I.

A.

Since 1961, Camden has operated under a Mayor-Council form of government under the Faulkner Act, pursuant to N.J.S.A. 40:69A-32. McCartney v. Franco, 82 N.J. Super. 570, 576 (Law

Div. 1964), aff'd, 87 N.J. Super. 292 (App. Div. 1965).  In a
Mayor-Council Faulkner Act municipality, subject to certain
exceptions identified in the statute, "administrative or
executive functions assigned by general law to the governing
body [are] exercised by the mayor, and any legislative and
investigative functions assigned by general law to the governing
body are exercised by the council."  N.J.S.A. 40:69A-32(b).
"Those functions shall be exercised pursuant to the procedures
set forth in this plan of government, unless other procedures
are required by the specific terms of the general law."  Ibid.
Among those applicable procedures is the initiative provision of
the Faulkner Act, under which "[t]he voters of any municipality
may propose any ordinance and may adopt or reject the same at
the polls."  N.J.S.A. 40:69A-184.

In 2002, recognizing that "[t]here exists in certain
municipalities a continuing state of fiscal distress which
endures despite the imposition of a series of measures
authorized pursuant to law," the Legislature enacted MRERA.  L.
2002, c. 43 (codified at N.J.S.A. 52:27BBB-2(a)).  Pursuant to
MRERA, the State funded projects in Camden under the supervision
of a State Economic Recovery Board and a State-appointed Chief
Operating Officer (COO).  See N.J.S.A. 52:27BBB-6, -7, -36.

On October 28, 2002, pursuant to MRERA, the State assumed
comprehensive oversight of Camden's financial, fiscal, and

7

budgetary affairs. The State's oversight of Camden's finances proceeded in two stages prescribed by MRERA. During the "rehabilitation" period, which concluded with the expiration of the COO's term on January 18, 2010, the COO's authority superseded that of Gwendolyn Faison, the former Mayor, and Mayor Redd, who was elected in 2009. See N.J.S.A. 52:27BBB-6, -7. Thereafter, during the five-year "recovery" period, extended by statute to ten years in 2014, L. 2014, c. 60, Mayor Redd has exercised the administrative and executive powers of her office. See N.J.S.A. 52:27BBB-3.

In addition to the extraordinary fiscal constraints imposed by MRERA, Camden has operated subject to the terms of the LBL, and two statutes governing State aid to municipalities, SMAA and TAL. See N.J.S.A. 40A:4-1 to -89 (LBL); N.J.S.A. 52:27D-118.24 to -118.31 (SMAA); N.J.S.A. 52:27D-118.42a (TAL). As provided for by SMAA and TAL, Camden has applied for and received State transitional aid during every fiscal year relevant to this case.[1] Pursuant to the terms of MRERA and SMAA, the Department's

---

[1] The record reveals that State municipal aid funded more than one-third of Camden's annual budget during the period relevant to this case. Camden's budget for Fiscal Year 2010 was $185,128,474.34, and the City received $67,000,000 in State municipal aid; Camden's budget for Fiscal Year 2011 was $172,973,295.39, and the City received $69,000,000 in State municipal aid; Camden's budget for Fiscal Year 2012 was $167,232,861.40, and the City received $61,400,000 in State municipal aid.

Division of Local Government Services has required Camden to enter into a series of Memoranda of Understanding setting forth the requirements imposed by the State on the City of Camden as a condition of its receipt of municipal aid.  According to Camden's Finance Director, the City's failure to comply with the terms of a Memorandum of Understanding would cause the State to reduce or terminate Camden's receipt of municipal aid.  See N.J.S.A. 52:27D-118.29(b) (stating that State aid payments may be withheld if "municipality fail[s] to implement fiscal recovery measures"); see also N.J.S.A. 52:27D-118.42a(a).

As Camden's municipal government and the State worked to restore the City to fiscal solvency, the Camden Police Department was subject to particular scrutiny.  In Fiscal Year 2012, police-related expenditures accounted for approximately one-third of the City's total budget expenditures, and during Fiscal Years 2010, 2011, and 2012, Police Department salaries and wages comprised almost one-half of the total salaries and wages paid by Camden to its employees.  On January 18, 2011, Camden conducted a layoff of 168 officers.  In the wake of the layoff, the police presence on Camden's streets was far short of the 400-officer force recommended by the City's security consultant.

On August 9, 2011, the Camden City Council approved a resolution authorizing "the proper officers . . . to enter into

9

a Memorandum of Understanding with the State Department of Community Affairs and the County of Camden to prepare a plan for the creation of the Camden County Police Department."  On August 25, 2011, Camden, the County, and the Department entered into a Memorandum of Understanding, in which they agreed to a series of steps leading to the formation of a Camden County Police Department.

The Camden City Council approved the immediate implementation of the terms of the August 25, 2011, Memorandum of Understanding in a Resolution dated December 27, 2011.  In that Resolution, the City Council resolved to "take all steps necessary to finalize the immediate implementation of the Memorandum of Understanding in furtherance of the establishment of the Camden County Police Department."  The Council recognized that with the formation of a Camden Metro Division of the countywide police force, the City would "dissolve the Police Department of the City of Camden," and the County would "offer the opportunity for employment in the Camden Metro Division . . . to qualified former members of the" municipal police department.

The City's resolution was followed by a corresponding resolution by the County's Board of Chosen Freeholders, introduced January 26, 2012, committing to "the necessary and appropriate measures to establish the Camden County Police

10

Department."  By early 2012, planning for the regionalization of Camden's police services had reached an advanced stage.

B.

The Committee of Petitioners, consisting of defendants Vance Bowman, Larry Gilliams, Eulisis Delgado, Mary I. Cortes, and Robert Davis, opposed the creation of a County Police Force on the ground that such a force would "simply result in less experienced officers, who are not familiar with the City of Camden, policing the [C]ity."  On April 11, 2012, the Committee circulated and submitted a petition for the adoption of a proposed ordinance pursuant to the initiative provision of the Faulkner Act, N.J.S.A. 40:69A-184.  The proposed ordinance provided:

> BE IT ORDAINED THAT:  Section 87-1 of Chapter 87 of the Code of the City of Camden, is hereby amended to read as follows:
>
> A.    There shall be created and maintained in continued existence, in, for and by the City of Camden, its own Police Department which shall remain the police department for the City of Camden and which shall consist of a Police Director, a Chief of Police and members and officers as shall be deemed necessary by the governing body of the City of Camden which shall, from time to time, determine the number of persons, including, without limitation, temporary officers and members in an emergency, to be appointed to these positions, together with their compensation, all as provided for under N.J.S.A. 40A:14-118.
>
> B.    The City of Camden shall not disband its police department pursuant to the creation of

11

any county wide Police Department established by or for the County of Camden and shall not participate or join in the creation of any such Police Department established by or for the County of Camden, nor participate in any consolidation of or regionalization of police services sought to be created by any establishment of a county wide police department, and shall instead continue to maintain its own police department.

On April 20, 2012, the Camden Municipal Clerk advised the Committee that he would move the certified petition forward as an ordinance to be considered at the May 8, 2012, City Council meeting.[2]

## II.

Mayor Redd and Council President Moran commenced this action on May 2, 2012. In their verified complaint, they sought a declaration that the Committee's proposed ordinance was null and void, and entry of an order (1) enjoining the Council from considering the ordinance, (2) the County Board of Elections from placing it on the ballot, and (3) all officials from enforcing the ordinance. Mayor Redd and Council President Moran alleged that the ordinance would act as an illegal restraint on

---

[2] The Camden Municipal Clerk determined that the petition contained a total of 2354 signatures and that 1379 were qualified signatures of registered voters in Camden. The Committee thus satisfied the Faulkner Act's requirement that a petition seeking to exercise the power of initiative be "signed by a number of the legal voters of the municipality equal in number to at least 15% of the total votes cast in the municipality at the last election at which members of the General Assembly were elected." N.J.S.A. 40:69A-184.

12

the exercise of municipal legislative power delegated to the Camden City Council by divesting successors of legislative power, that it violated Camden's statutory powers under N.J.S.A. 40A:14-118, and that it unduly restricted the fiscal and budgetary authority for Camden, a power exclusively vested in the City and State.

A week later, the trial court entered temporary restraints enjoining the Camden Municipal Clerk from certifying or submitting the proposed ordinance to the City Council. On June 12, 2012, the trial court issued an opinion and order prohibiting the municipal clerk from certifying the petition to the Camden City Council. It held that the initiated ordinance would create an undue restraint on future legislation. The trial court rejected the plaintiffs' argument that the ordinance unduly restricted the municipality's exclusive statutory authority under the Police Force Statute, N.J.S.A. 40A:14-118. Citing the potential impact of its decision on a pending, separate legal challenge to the Camden police reorganization, the trial court did not reach the question whether MRERA or the state fiscal statutes preempted the Faulkner Act initiative pursued by the Committee. The Committee appealed. It initially pursued a motion to accelerate the appeal, which was ultimately denied by the Appellate Division.

13

While the Committee's appeal was pending, Camden and the County took the final steps to regionalize Camden's police services. Effective January 1, 2013, the County formally established the Camden County Police Department. On April 30, 2013, the City of Camden disbanded the Camden Police Department and permanently laid off the members of that department. On May 1, 2013, the Camden Metro Division of the County Police Department began providing police services to the City of Camden. It continues to provide those services today.

The Appellate Division reversed the determination of the trial court, holding that the initiated ordinance did not constitute an improper divestment of the municipal governing body's legislative power. Redd, supra, 433 N.J. Super. at 193-94. Turning to the question of preemption, the panel concurred with Mayor Redd and Council President Moran that MRERA and the state fiscal statutes suggested a legislative intent to fully occupy the field of municipal finance in Camden. Id. at 197-98. It remanded the case to the trial court for further consideration of the issue of preemption. Id. at 198.

We granted the petitions for certification filed by Mayor Redd and Council President Moran, and the cross-petition for certification filed by the Committee. Redd, supra, 217 N.J. 293. We also granted the motions of the New Jersey Appleseed

14

Public Interest Law Center (New Jersey Appleseed) and the Department to appear as amici curiae.

III.

Mayor Redd and Council President Moran urge the Court to either grant judgment in their favor or dismiss the appeal as moot. They note that Camden has already disbanded its Police Department and has contracted to receive its police services from the County police force, an action that cannot be undone in a reasonable manner. They contend that the Committee should have proceeded by referendum after the Council passed an ordinance disbanding the municipal police force, rather than prospectively challenge Camden's action under the initiative procedure of the Faulkner Act.

Mayor Redd and Council President Moran argue that the trial court was correct to find that the proposed ordinance would have constituted an unlawful prior restraint on the legislative power of the governing body. They assert that in light of the State's comprehensive supervision, regulation, and occupation of the field with respect to Camden's finances through MRERA, SMAA, TAL and LBL, as well as agreements between Camden and the State, the Committee's Faulkner Act ordinance is preempted under the five-part test of Overlook Terrace Management Corp. v. Rent Control Board of West New York, 71 N.J. 451, 461-62 (1976). Moran

15

offers the additional argument that the initiated ordinance is preempted by the Police Force Statute, N.J.S.A. 40A:14-118.

The Committee argues that the Court should not dismiss the appeal as moot because the question of mootness was not raised in the Appellate Division, and the question before the Court is not moot. It observes that Camden voluntarily proceeded with the police reorganization knowing that the Committee's appeal was pending. The Committee contends that, notwithstanding the events of the past two years, the voters of Camden may vote on the proposed ordinance because the ordinance sets standards in general and prospective terms, and is not confusing.

Further, the Committee urges the Court to decide the preemption issue, notwithstanding Camden's police reorganization, because of the potential for future Faulkner Act challenges to the decisions of Camden's governing body. It dismisses the argument of Mayor Redd and Council President Moran that a referendum, rather than an initiative, was the proper procedure under the Faulkner Act, on the grounds that the argument was not raised before the trial court and is wrong on its merits. The Committee also contends that the trial court erred when it held that the initiated ordinance would unlawfully divest the Camden governing body of its legislative power. Finally, the Committee challenges the Appellate Division's remand for consideration of the preemption issue, arguing that

16

the Legislature has not clearly stated an intention to bar Faulkner Act challenges to actions by the Camden governing body with respect to municipal finances or police services.

Amicus curiae New Jersey Appleseed addresses only the issue of divestment of legislative power. It argues that the Appellate Division correctly determined that the trial court erred with respect to the question of an unlawful restraint on municipal legislative authority, but that the panel's reasoning was incorrect. It contends that because the Committee's initiated petition is an ordinary enactment with only "inertial" force against future lawmakers, and that nothing in the ordinance makes it impossible or unusually burdensome for future City Councils to amend or repeal it, it is a valid application of the Faulkner Act.

As amicus curiae, the Department of Community Affairs supports the position of Mayor Redd and Council President Moran that the Committee's proposed ordinance is preempted by MRERA, SMAA, and TAL. It asserts that the ordinance expressly prohibits the regionalization of Camden's police services, which is one of several "exceptional measures" mandated by the Department. The Department notes that pursuant to a 2010 amendment to MRERA, N.J.S.A. 52:27BBB-23(a)(2), in Camden's "recovery" phase, ordinances and resolutions adopted by its

17

governing body remained subject to review and veto by the Commissioner of Community Affairs.

## IV.

### A.

As a threshold matter, we do not concur with the assertion of Mayor Redd and Council President Moran that this appeal should be dismissed as moot. An issue is "moot when our decision sought in a matter, when rendered, can have no practical effect on the existing controversy." Deutsche Bank Nat'l Trust Co. v. Mitchell, 422 N.J. Super. 214, 221-22 (App. Div. 2011) (internal quotation marks omitted); Greenfield v. N.J. Dep't of Corr., 382 N.J. Super. 254, 257-58 (App. Div. 2006). This is not a direct action seeking to enjoin the dissolution of the municipal department and the creation of the countywide police force. The question raised by the parties is whether the Committee's proposed initiated ordinance is valid, and therefore must be presented to the Council pursuant to N.J.S.A. 40:69A-184. This is a justiciable issue that can and should be resolved by this Court. The remedy sought by Mayor Redd and Council President Moran can still be granted or denied. Consequently, we decline to dismiss this appeal as moot.

We review de novo the legal determinations of the trial court and Appellate Division as to the interplay between the Faulkner Act, MRERA, and the relevant State fiscal and police

18

force statutes.  In re Petition for Referendum on Trenton Ordinance 09-02, 201 N.J. 349, 358 (2010) (citing Manalapan Realty L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).  "Our task in statutory interpretation is to determine and effectuate the Legislature's intent."  Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553 (2009) (citations omitted); see also N.J.S.A. 1:1-1 (instructing that words and phrases be given their generally accepted meaning "unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated").

Governed by these principles, we consider the Legislature's intent when it conferred on the voters the initiative power set forth in N.J.S.A. 40:69A-184.  That provision was the product of a 1982 legislative reform intended to "make[] uniform the initiative and referendum procedures of municipalities operating under the 'Walsh Act[,]' [N.J.S.A. 40:70-1 to 78-27,] and the 'Faulkner Act.'"[3]  S. Cnty. & Mun. Gov't Comm. Statement to S. 763 (Mar. 1, 1982).  The 1982 amendments followed a finding that "[t]he initiative and referendum provisions of the 'Walsh Act,' which date from 1911, are rather vague, often confusing, and use archaic terms.  Those of the 'Faulkner Act,' written in 1950,

---

[3] The Walsh Act was "the first New Jersey municipal charter law to give voters the power of initiative and referendum."  Tumpson v. Farina, 218 N.J. 450, 465 (2014) (citation omitted).

19

while more complete and modern, lack certain of the stronger provisions of the 'Walsh Act.'" Ibid.

As amended, the Faulkner Act's initiative provision confers on the voters the right to propose an ordinance, if the petition includes a sufficient number of signatures. See N.J.S.A. 40:69A-184.

> The voters of any municipality may propose any ordinance and may adopt or reject the same at the polls, such power being known as the initiative. Any initiated ordinance may be submitted to the municipal council by a petition signed by a number of the legal voters of the municipality equal in number to at least 15% of the total votes cast in the municipality at the last election at which members of the General Assembly were elected. An initiated ordinance may be submitted to the municipal council by a number of the legal voters of the municipality equal in number to at least 10% but less than 15% of the total votes cast in the municipality at the last election at which members of the General Assembly were elected, subject to the restrictions set forth in [N.J.S.A. 40:69A-192].
>
> [Ibid.][4]

---

[4] The corresponding referendum provision gives the voters "the power to approve or reject at the polls any ordinance submitted by the council to the voters or any ordinance passed by the council," if a referendum petition meeting the statute's requirements has been submitted. N.J.S.A. 40:69A-185; see Tumpson, supra, 218 N.J. at 468-72 (discussing requirements of Faulkner Act referendum provision); In re Referendum Petition to Repeal Ordinance 04-75, 192 N.J. 446, 459-62, 464-67 (2007) (same).

"The 'salutary purposes' of both initiative and referendum include 'arousing public interest' and 'placing in the hands of the voters . . . direct means of controlling proposed or already enacted municipal legislation and also of accomplishing the enactment of legislation which has neither been proposed nor adopted.'"  City of Ocean City v. Somerville, 403 N.J. Super. 345, 352 (App. Div. 2008) (quoting Maese v. Snowden, 148 N.J. Super. 7, 11 (App. Div. 1977), superseded on other grounds by statute as stated in Redd, supra, 433 N.J. Super. at 190-92). The Faulkner Act's initiative and referendum procedures "comprise two useful instruments of plebiscite power."  Twp. of Sparta v. Spillane, 125 N.J. Super. 519, 523 (App. Div. 1973), certif. denied, 64 N.J. 493 (1974).

The Legislature's clear expression of intent to grant to voters in Faulkner Act municipalities broad powers of initiative provides the setting for our review of the Committee's challenge to the Camden police reorganization.

B.

We concur with the Appellate Division that, as applied in this case, the Committee's Faulkner Act initiative petition does not constitute an unlawful restraint on the Council's future exercise of its legislative power.  See Redd, supra, 433 N.J. Super. at 188-94.

As the trial court and Appellate Division recognized, in the absence of specific authorization from the Legislature, a governing body cannot "'divest its successors of legislative power.'" Redd, supra, 433 N.J. Super. at 188-89 (quoting Ocean City, supra, 403 N.J. Super. at 359); Maese, supra, 148 N.J. Super. at 13 (citing 4 McQuillin on Municipal Corporations § 13.03(b) (3d ed. rev. 1968)). There is an exception to that general principle, however, when the Legislature specifically authorizes present legislative bodies to restrict the legislative powers of their successors. Ocean City, supra, 403 N.J. Super. at 359; Maese, supra, 148 N.J. Super. at 13. In the Faulkner Act, the Legislature has clearly expressed an intent to effect a limited divestment of one aspect of the governing body's legislative power -- its authority to repeal an ordinance passed by initiative in accordance with N.J.S.A. 40:69A-184. As part of its 1982 amendments, the Legislature determined that, for a period of three years, an ordinance passed by either initiative or referendum may be amended or repealed only by voter action. S. Cnty. & Mun. Gov't Comm. Statement to S. 763, supra. The section provides:

> If a majority of the qualified electors voting on the proposed ordinance shall vote in favor thereof, such ordinance shall thereupon become a valid and binding ordinance of the municipality and be published as in the case of other ordinances. No such ordinance shall be amended or repealed within 3 years

22

immediately following the date of its adoption by the voters, except by a vote of the people. The council may, within 3 years immediately following the date of adoption of the ordinance, submit a proposition for the repeal or amendment of that ordinance to the voters at any succeeding general election or regular municipal election. If the proposition submitted shall receive a majority of the votes cast at that election, the ordinance shall be repealed or amended accordingly. If the provisions of two or more measures approved or adopted at the same election conflict then the measure receiving the greatest affirmative vote shall control.

[N.J.S.A. 40:69A-196(a); see also L. 2009, c. 339 (amending N.J.S.A. 40:69A-196 to add paragraph (b), but leaving paragraph (a) intact).]

As this Court has observed in applying the referendum provision of the Faulkner Act, "[i]t is the function of the Legislature, not the courts, to determine how much direct democracy through referendum should be conferred on the voters of a municipality." Ordinance 04-75, supra, 192 N.J. at 467. The same principle governs the initiative in this case. The Legislature has authorized the divestment, for a prescribed period, of one aspect of a succeeding governing body's authority, when an ordinance is enacted by initiative in accordance with N.J.S.A. 40:69A-184.[5]

---

[5] Following the expiration of that period, the governing body may amend or repeal the initiated ordinance, as it may amend or repeal any other ordinance, pursuant to the authority granted to it under N.J.S.A. 40:48-1.

23

By virtue of this short-term constraint created by the Legislature, which would temporarily limit the authority of Camden's current and successor legislatures in the event that the Committee's initiated ordinance were adopted, the ordinance would not constitute an improper restraint on future legislative authority. We affirm the Appellate Division's determination regarding this issue.

C.

"[A] court may declare an ordinance invalid if it . . . is preempted by superior legal authority." Rumson Estates, Inc. v. Mayor of Fair Haven, 177 N.J. 338, 351 (2003) (citing United Bldg. & Constr. Trades Council v. Mayor of Camden, 88 N.J. 317, 343 (1982)). "Preemption is a judicially created principle based on the proposition that a municipality, which is an agent of the State, cannot act contrary to the State." Overlook, supra, 71 N.J. at 461 (citing Summer v. Twp. of Teaneck, 53 N.J. 548, 554 (1969)). In a preemption analysis, the initial question is "whether the field or subject matter in which the ordinance operates, including its effects, is the same as that in which the State has acted." Ibid. If the "field or subject matter" of the municipal ordinance and state law are not the same, there is no preemption; if they are the same, then the question of preemption is further explored. Ibid. "The ultimate question is whether, upon a survey of all the interests

24

involved in the subject, it can be said with confidence that the Legislature intended to immobilize the municipalities from dealing with local aspects otherwise within their power to act." Summer, supra, 53 N.J. at 555. "It is not enough that the Legislature has legislated upon the subject . . . ." Id. at 554 (citation omitted).

In Overlook, supra, this Court set forth the following five-factor test for determining whether a state law preempts a municipal ordinance:

> 1. Does the ordinance conflict with state law, either because of conflicting policies or operational effect (that is, does the ordinance forbid what the Legislature has permitted or does the ordinance permit what the Legislature has forbidden)?
>
> 2. Was the state law intended, expressly or impliedly, to be exclusive in the field?
>
> 3. Does the subject matter reflect a need for uniformity? . . .
>
> 4. Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation?
>
> 5. Does the ordinance stand "as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Legislature?
>
> [71 N.J. at 461-62 (citations omitted).]

The Overlook factors have served as the governing standard in several settings in which courts determined whether state law preempts a local ordinance. See, e.g., Mack Paramus Co. v.

25

Mayor of Paramus, 103 N.J. 564, 566, 573-74 (1986) (citing Overlook factors to assess whether local Sunday blue law ordinances were preempted by State Sunday blue law); Lake Valley Assocs. v. Twp. of Pemberton, 411 N.J. Super. 501, 505-06 (App. Div.) (noting that, "[o]rdinarily, to determine whether an ordinance or part thereof is preempted by statute, the court should consider the [five] factors set forth in Overlook," but such inquiry was not needed when statute explicitly provided that it was not intended to preempt local ordinances), certif. denied, 202 N.J. 43 (2010); Crow-N.J. 32 Ltd. v. Twp. of Clinton, 718 F. Supp. 378, 385-86 (D.N.J. 1989) (citing Overlook "guidelines for deciding whether a state statute preempts a local ordinance").

The preemption standard of Overlook is consistent with the principles stated in two recent opinions in which this Court rejected challenges to referendum petitions submitted pursuant to the Faulkner Act, Trenton Ordinance 09-02, supra, 201 N.J. at 359-64, and Ordinance 04-75, supra, 192 N.J. at 464-69. Although it does not appear that the municipality challenging the referendum in either case couched its contention as a preemption argument, the issues raised in both appeals are closely related to the preemption argument asserted by Mayor Redd and Council President Moran in this case, and thus, the Court's analysis in both instances is instructive.

26

In Ordinance 04-75, supra, the Court rejected the reasoning of a line of cases that exempted "administrative" ordinances from the reach of the Faulkner Act. 192 N.J. at 467-70. The Court cited the expansive language of the Faulkner Act referendum provision, which gives the voters "the power to approve or reject at the polls . . . any ordinance passed by the council" and challenged by referendum. Id. at 460 (quoting N.J.S.A. 40:69A-185). It also identified a panoply of statutes in which the Legislature demonstrated that it "knew precisely how to exclude particular ordinances from the purview of the referendum statute when it wished to do so." Id. at 466-67. The Court then observed:

> That sampling clearly establishes that the Legislature has determined, on multiple occasions, those municipal matters that should not be called before the voters in a referendum. Because the Legislature has made exceptions to N.J.S.A. 40:69A-185 with such precision in a multitude of statutes, we cannot find that it intended an amorphous legislative/administrative distinction that cannot be gleaned from the statute's text, legislative history, or place in the larger statutory scheme.
>
> [Id. at 467.]

Following the analysis of Ordinance 04-75, the Court held in Trenton Ordinance 09-02, supra, that the Municipal Utilities Law, N.J.S.A. 40:62-1 to -151, which provided for Board of Public Utilities review of the sale of Trenton's water works

27

system, was not intended to deprive the public of its referendum power under the Faulkner Act. 201 N.J. at 353, 359-68. The Court reiterated the holding of Ordinance 04-75 that

> where the legislative intent is not clear "from the statute's text, legislative history, or place in the larger statutory scheme[,]" an intention to immunize an ordinance from a Faulkner Act challenge will not be found. Put another way, in the absence of an unequivocal legislative expression to the contrary, citizens in a Faulkner Act municipality are empowered to protest any ordinance under the Act. The burden is on the party seeking to defeat the Faulkner Act to clearly establish the existence of a contrary legislative intent.
>
> [Id. at 362 (quoting Ordinance 04-75, supra, 192 N.J. at 467).]

Thus, the Overlook standard that generally governs questions of state preemption of municipal ordinances, and the Court's two recent decisions applying the referendum provision of the Faulkner Act, direct that we discern whether the Legislature intended to deny voters the power of initiative in the setting of this case. The broad statutory language, on which the Court's holdings in Ordinance 04-75 and Trenton Ordinance 09-02 rest, finds an exact counterpart in the initiative provision of the Faulkner Act. The Act permits the voters of any municipality to "propose any ordinance and . . . adopt or reject the same at the polls." N.J.S.A. 40:69A-184; see Ocean City, supra, 403 N.J. Super at 357 (noting that

28

Faulkner Act's initiative provision "by its very terms admits of no qualification").  Accordingly, we review MRERA and the fiscal statutes on which Mayor Redd and Council President Moran rely, as well as the Police Force Statute invoked by Council President Moran, to determine whether the Legislature intended to deny a properly framed Faulkner Act ordinance to preclude the police reorganization undertaken by Camden in 2013.

The Memorandum of Understanding, which prompted the regionalization of the Camden police force, followed years of State oversight of Camden's finances, and is rooted in the LBL, SMAA, TAL, and, most directly and specifically, MRERA.  The LBL generally charges the Department's Division of Local Government Services with significant oversight of municipal budgets, which must be certified by the Director of the Division.  N.J.S.A. 40A:4-76 to -79.[6]  The LBL requires local municipalities to enact a balanced budget in every fiscal year.  See Ocean City, supra, 403 N.J. Super. at 363-64 (explaining municipal budget process);

---

[6] LBL provides that "[t]he governing body of each local unit shall adopt a budget for each fiscal year."  N.J.S.A. 40A:4-3. The Director of the Division of Local Government Services will then "examine the budget for detail and accuracy of itemization and for compliance as to form, arrangement and content with the provisions of [Chapter 4] and the regulations of the local government board."  N.J.S.A. 40A:4-76.  "Immediately after the making of his examination of the budget, the director shall certify the results of his determination to the governing body. A governing body shall not finally adopt a budget until a certification of approval by the director has been received." N.J.S.A. 40A:4-79.

accord <u>Cnty. of Morris v. Skokowski</u>, 86 <u>N.J.</u> 419, 422-23 (1981). The statute imposes on Camden and other municipalities detailed requirements with respect to the process of enacting a municipal budget, but contains no evidence that the Legislature intended to preempt the Faulkner Act initiative at issue in this case.[7]

For municipalities such as Camden that were eligible for municipal aid, SMAA prescribes a procedure by which the Director of the Division of Local Government Services determines that the "municipality is experiencing fiscal distress and may require assistance under [N.J.S.A. 52:27D-118.24 to 118.31]," and reports that finding to the Local Finance Board. <u>N.J.S.A.</u> 52:27D-118.28. After reviewing the municipality's finances and meeting with the governing body and other "interested parties," the director is required to "notify the board of the findings of the review and . . . recommend to the board actions necessary to be taken by the municipality, which may include the provision of short-term financial aid." <u>Ibid.</u> The Legislature clearly stated in SMAA that the implementation of reforms necessary to the

---

[7] As this Court noted in <u>Ordinance 04-75</u>, <u>supra</u>, the Faulkner Act's referendum provision "contains at least a partial, if not total, exception to the referendum rule for municipal budgets," because in <u>N.J.S.A.</u> 40:69A-185, the Legislature exempted local budget ordinances from the otherwise applicable twenty-day waiting period before they become effective. 192 <u>N.J.</u> at 465-66. The Court read this provision to "signify[] that, unlike other ordinances, a budget ordinance cannot be suspended" under the Faulkner Act. <u>Id.</u> at 465.

30

municipality's financial recovery was a condition of receiving State aid under N.J.S.A. 52:27D-118.24 to -118.31:

> As a condition of receiving assistance under the provisions of [N.J.S.A. 52:27D-118.24 to -118.31], an eligible municipality shall implement any government, administrative and operational efficiency, and oversight measures necessary for the fiscal recovery of the municipality as recommended by the director and approved by the board, and be subject to management and fiscal audit by the director.
>
> . . . .
>
> b. The director may withhold from an eligible municipality any State aid payments that are disbursed by the Division of Local Government Services if the director finds the municipality has failed to implement fiscal recovery measures approved by the board. Upon withholding an aid payment, the director shall report to the board the circumstances surrounding the reasons for withholding aid. The board shall then hold a hearing to give the eligible municipality an opportunity to explain why such aid payments should not continue to be withheld, and what action the eligible municipality plans to take to implement the fiscal recovery measures. Upon completion of the hearing, the board shall determine if State aid payments should continue to be made to the municipality, establish a schedule for such payments when appropriate, and determine what other actions should be taken.
>
> [N.J.S.A. 52:27D-118.29.]

In 2011, TAL replaced the SMAA scheme and two other existing municipal aid programs. See S. Budget & Appropriations Comm. Statement to S. 3118 (Dec. 8, 2011). The Senate Budget

31

and Appropriations Committee declared that "[a]pplying for aid under this program is a declaration that the municipality is not capable of managing its finances without special State assistance and intervention." Ibid. Under TAL, the Director of the Division of Local Government Services exercises broad oversight of the municipality's operations, focusing on, but not limited to, its fiscal management. See N.J.S.A. 52:27D-118.42a(a).

> The Director of the Division of Local Government Services in the Department of Community Affairs shall determine conditions, requirements, orders, and oversight for the receipt of any amount of grants, loans, or any combination thereof, provided to any municipality through the [TAL] program or any successor discretionary aid programs for municipalities in fiscal distress. Conditions, requirements, or orders deemed necessary by the director may include, but not be limited to, the implementation of government, administrative, and operational efficiency and oversight measures necessary for the fiscal recovery of the municipality, including but not limited to requiring approval by the director of personnel actions, professional services and related contracts, payment in lieu of tax agreements, acceptance of grants from State, federal or other organizations, and the creation of new or expanded public services.
>
> [Ibid.]

SMAA and TAL plainly reveal the Legislature's determination that municipal aid for Camden and other qualified municipalities is premised on the municipalities' compliance with a broad

32

spectrum of conditions and requirements imposed by the State. See N.J.S.A. 52:27D-118.24 to 118.31; N.J.S.A. 52:27D-118.42a. Under SMAA and TAL, a municipality's failure to comply with the State directives authorized by the Legislature may have dire fiscal consequences. See N.J.S.A. 52:27D-118.29(b). Nonetheless, neither statute bars a municipality from enacting ordinances by initiative or referendum under the Faulkner Act that contravene a condition imposed by the State. Although such an ordinance might imperil state funding under SMAA or TAL, it is not preempted by either statute.

In enacting MRERA in 2002, the Legislature clearly viewed the statute as an extraordinary response to a crisis of both fiscal management and public safety.[8] Citing "a continuing state

---

[8] Camden meets the definition of a "qualifying municipality" under MRERA. Camden City Bd. of Educ. v. McGreevey, 369 N.J. Super. 592, 607 (App. Div. 2004). MRERA defines a qualified municipality as one

> (1) that has been subject to the supervision of a financial review board pursuant to the "Special Municipal Aid Act," L. 1987, c. 75 [N.J.S.A. 52:27D-118.24 to -118.31] for at least one year; (2) that has been subject to the supervision of the Local Finance Board pursuant to the "Local Government Supervision Act (1947)," L. 1947, c. 151 [N.J.S.A. 52:27BB-1 to -23] for at least one year; and (3) which, according to its most recently adopted municipal budget, is dependent upon State aid and other State revenues for not less than 55 percent of its total budget.

> [N.J.S.A. 52:27BBB-3.]

33

of fiscal distress which endures despite the imposition of a series of measures authorized pursuant to law," and "a lack of internal audit controls, accountability and oversight," the Legislature acknowledged the failure of prior efforts to encourage economic growth.  N.J.S.A. 52:27BBB-2 (a), (g).

In addition to several provisions regarding the fiscal management of a qualified municipality, the Legislature specifically addressed the need for a police force sufficient to protect public safety:

> Given the high crime rates in these municipalities, if economic recovery is to be successful, it is vital that municipal residents feel that their basic safety is assured; accordingly, the State will continue to commit to assist such municipalities in maintaining not less than that number of police officers employed by the municipality at the time of the determination by the commissioner that the municipality fulfills the definition of a qualified municipality and in creating working relationships between State agencies, local law enforcement and the community to identify and develop strategies to improve the quality of life and the security of residents in qualified municipalities.
>
> [N.J.S.A. 52:27BBB-2(*l*).]

In MRERA, the Legislature mandated that State and municipal officials focus on the efficacy and cost of police services. See, e.g., N.J.S.A. 52:27BBB-2(b) (providing that municipalities qualified under MRERA "have a history of high crime rates . . . that has necessitated the maintenance of large police and fire

34

departments, at enormous taxpayer cost in municipalities without a sound tax base"); N.J.S.A. 52:27BBB-12(d) (mandating study to "analyze the current state of [public safety] services . . . and make recommendations for current and future staffing levels in order to realize appropriate levels of service"). Thus, the Legislature disclosed a clear intent that the State and the local governing body, such as Camden, would scrutinize, and, as necessary, reform the delivery of police services to its residents.

In MRERA, however, the Legislature reaffirmed that a municipality's status as a qualified municipality would leave in place the form of government chosen prior to its entry into the rehabilitation and economic recovery phases prescribed by the statute. The statute provides that "[n]otwithstanding that a municipality has been placed under rehabilitation and economic recovery under [N.J.S.A. 52:27BBB-1 to -79], the municipality shall remain a body corporate and politic in the same manner as existed prior to rehabilitation and economic recovery." N.J.S.A. 52:27BBB-34(a). Moreover, MRERA directs that a qualified municipality retain its chosen form of government:

> Unless otherwise provided pursuant to [N.J.S.A. 52:27BBB-1 to -79], the governing body shall retain all functions, powers and duties prescribed to it pursuant to the charter and administrative code of the municipality, . . . [including] any specific form of government law according to which the

35

municipality is governed, and such other sections or other laws which govern municipal operation or administration.

[N.J.S.A. 52:27BBB-25.]

As those provisions reflect, the Legislature intended that ordinances be enacted in a qualified municipality in accordance with the procedures mandated for the form of government chosen by the municipality. In the case of Camden, a Faulkner Act municipality, three processes are prescribed by the Faulkner Act for the enactment of an ordinance: council vote, N.J.S.A. 40:69A-180 to -181; initiative, N.J.S.A. 40:69A-184; and referendum, N.J.S.A. 40:69A-185. An ordinance, however enacted, that undermines an agreement reached by Camden pursuant to MRERA may prompt the State to withhold municipal aid under the statute, but there is nothing in MRERA that expresses a legislative intent to preempt the Faulkner Act process. Instead, MRERA reaffirms Camden's status as a Faulkner Act municipality, and by inference, the initiative and referendum procedure at the Faulkner Act's core.

The Legislature has extensively addressed the field of municipal finance in Camden, particularly in SMAA, TAL and MRERA, but it has not done so to the exclusion of a municipal role, as the actions taken by Camden illustrate. See generally N.J.S.A. 52:27D-118.24 to -118.31, 52:27D-118.42a, 52:27BBB-1 to -79. Although the Legislature clearly intended that a decision

36

by Camden not to reform its police services would have serious ramifications for the City, it left open the possibility that Camden would reject the State-imposed conditions, and with that, its State aid.  See N.J.S.A. 52:27D-118.29(b), 52:27D-118.42a. It did not purport to bar Camden from enacting ordinances -- including ordinances with negative fiscal consequences to the municipality -- by initiative or referendum.

Thus, in accordance with the standard set forth in Overlook, and in accord with this Court's decisions in Ordinance 04-75 and Trenton Ordinance 09-02, the Legislature's intent is clear -- to preserve the Faulkner Act procedures notwithstanding Camden's status as a qualified municipality under N.J.S.A. 52:27BBB-3.  MRERA does not preempt the power of initiative conferred by the Legislature in the Faulkner Act.

Similarly, we discern no legislative intent in the Police Force Statute to preempt the police regionalization ordinance. That statute authorizes "[t]he governing body of any municipality [to] create and establish, as an executive and enforcement function of municipal government, a police force." N.J.S.A. 40A:14-118.

Nothing in the Police Force Statute precludes the voter initiative and referendum procedures set forth in the Faulkner Act.  See Ordinance 04-75, supra, 192 N.J. at 451-55, 470 (affirming validity of Faulkner Act referendum challenging

37

ordinance regarding composition of police force created pursuant to N.J.S.A. 40A:14-118).  Indeed, like MRERA, the Police Force Statute reaffirms the form of government adopted by the municipality:

> Any such ordinance shall, in a manner consistent with the form of government adopted by the municipality and with general law, provide for a line of authority relating to the police function and for the adoption and promulgation by the appropriate authority of rules and regulations for the government of the force and for the discipline of its members.
>
> [N.J.S.A. 40A:14-118.]

The Legislature thus expressly acknowledged in the Police Force Statute that a police ordinance would be enacted consistent with the form of government chosen by the municipality -- in Camden's case, the Faulkner Act Mayor-Council form of government prescribed by N.J.S.A. 40:69A-32.  The Police Force Statute does not preempt the Faulkner Act's mechanisms and invalidate the Committee's proposed ordinance.

Accordingly, we hold that the Faulkner Act initiated, proposed ordinance at issue here is not invalid by virtue of preemption by either MRERA, SMAA, TAL, LBL, or the Police Force Statute.  We reverse that portion of the Appellate Division's judgment that remanded the matter to the trial court for the development of a record on the issue of preemption.

D.

38

Although MRERA does not preempt the Faulkner Act as applied here, it clearly expresses the Legislature's intent that during the "economic recovery term" as defined in N.J.S.A. 52:27BBB-3 and -6, any duly authorized ordinance -- whether passed by vote of the council or presented to the voters by initiative -- is subject to the authority granted to the Commissioner of Community Affairs. MRERA provides:

> During the economic recovery term, in addition to the normal procedures for adopting resolutions and ordinances set forth in the form of government of the qualified municipality, within three business days following each meeting of the governing body, a copy of each ordinance and resolution which has been adopted by the governing body shall be forwarded to the Commissioner of Community Affairs, who shall have 10 days from the receipt thereof to veto the ordinance or resolution, as the case may be. Any veto action by the commissioner shall be submitted to the governing body within 10 days of the veto. Within five business days thereafter, the governing body may override the veto by a two-thirds vote of the fully authorized membership thereof . . . .
>
> [N.J.S.A. 52:27BBB-23(a)(20) (emphasis added).]

Accordingly, any ordinance submitted to the Council by initiative petition is subject to the Commissioner's veto authority as set forth in N.J.S.A. 52:27BBB-23(a)(2). Moreover, the Legislature has clearly stated in SMAA that municipalities that disregard requirements imposed by the Department and

39

Memoranda of Understanding risk the loss of essential state aid. See N.J.S.A. 52:27D-118.29(b).

When we review separate legislative enactments, we have "'an affirmative duty to reconcile them, so as to give effect to both expressions of the lawmakers' will.'" Trenton Ordinance 09-02, supra, 201 N.J. at 359 (quoting St. Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 14 (2005)). In accordance with that principle, we reconcile the Faulkner Act procedures with the veto provision of N.J.S.A. 52:27BBB-23(a)(2) and the conditions imposed by the fiscal statutes, as follows.

If an ordinance such as that proposed by the Committee were to be submitted to the Council and the Council did not pass it, thus invoking the procedure in N.J.S.A. 40:69A-191 for submission of the ordinance to the voters, the Commissioner must be afforded the opportunity to veto the proposed initiative ordinance within the ten-day time frame set forth in N.J.S.A. 52:27BBB-23(a)(2). Although MRERA is silent as to whether the Commissioner must accompany any veto of the initiated ordinance with a message explaining his or her action, in the setting here, such a message is essential to inform voters about the import of the ordinance.[9] If the Commissioner's analysis

---

[9] Although the Faulkner Act does not mandate that a petition initiative be accompanied by an interpretive statement, the drafters have indicated that such a statement is permissible. See N.J.S.A. 40:69A-15; Polillo v. Deane, 74 N.J.

40

indicates that an ordinance regarding the countywide police force will result in a substantial reduction of police officers and loss of significant state aid to Camden, then the voters should be informed of that fact.  If the voters adopt the initiated petition after being informed of the Commissioner's objections, their decision to enact the ordinance functions as the equivalent of the governing body's override, as envisioned by the Legislature in MRERA.  N.J.S.A. 52:27BBB-23(a)(2).[10]

By virtue of the distinctions between the process followed by a governing body in passing ordinances and the initiative procedure of N.J.S.A. 40:69A-184, it is impractical to precisely replicate MRERA's intended process for the Commissioner's veto pursuant to N.J.S.A. 52:27BBB-23(a)(2) in a Faulkner Act setting.  It is, for example, impossible to impose MRERA's

_____

562, 573 n.6 (1977).  An interpretive statement is designed to aid voters in understanding the matter to be voted upon.  Bd. of Chosen Freeholders of Morris v. State, 159 N.J. 565, 582 (1999); Gormley v. Lan, 88 N.J. 26, 37 (1981).  An interpretive statement under the Faulkner Act should conform to N.J.S.A. 19:3-6, which authorizes "a brief statement interpreting the [question before the voters] and setting forth the true purpose of the matter being voted upon in addition to the statement of the public question required by the statute itself."  Cf. City of N. Wildwood v. N. Wildwood Taxpayers' Ass'n, 338 N.J. Super. 155, 163, 165 (Law Div. 2000) (stating that election law statute and Faulkner Act provisions are read in pari materia and invalidating misleading and prejudicial interpretative statement).

[10] A similar process would occur if the Council approved an initiated ordinance, the Commissioner vetoed that ordinance pursuant to N.J.S.A. 52:27BBB-23(a)(2), and the Council did not override the veto.

41

strict deadlines for the veto process when, under the Faulkner Act, voter review of the initiated ordinance must await a general, regular municipal or special election.  See N.J.S.A. 52:27BBB-23(a)(2); N.J.S.A. 40:69A-192.  Further, although N.J.S.A. 52:27BBB-23(a)(2) envisions that the Commissioner's opportunity to veto will follow the governing body's adoption of an ordinance, that process cannot be duplicated when an ordinance has been proposed by initiative, rejected by the governing body, and submitted by the municipal clerk to the voters under N.J.S.A. 40:69A-191.  The Commissioner's veto is necessarily exercised with respect to an ordinance that has not been adopted by the voters.  The process that we set forth reconciles the objectives and provisions of the statutes as closely as possible.

Accordingly, in light of Camden's status as a municipality in the recovery phase of the MRERA process, the Faulkner Act procedure for the enactment of an initiated ordinance for the reorganization of the police force must incorporate the Commissioner's veto authority as set forth in N.J.S.A. 52:27BBB-23(a)(2).  If an initiated ordinance is submitted to the voters of Camden following the Commissioner's veto, the voters should be informed in an interpretive statement about the Commissioner's veto and the reasons therefore, including, if

42

applicable, the law enforcement and fiscal consequences that would follow the adoption of the ordinance.

E.

Although a Faulkner Act initiated petition challenging the Camden police reorganization is not invalid as a divestment of legislative power or by virtue of preemption, the ordinance at issue in this case may not be submitted to the voters of Camden. By virtue of the disbanding of Camden's municipal police force, the creation of the County Police Department and two years of police services provided to the citizens of Camden by the County Department's Metro Division, the ordinance in this appeal is out of date, inaccurate, and misleading.

The ordinance at issue stands in stark contrast to the current circumstances. Its first paragraph mandates the creation and maintenance "in continued existence" of the Camden Police Department, which has been replaced by the Metro Division. The second paragraph directs Camden not to disband its police department "pursuant to the creation of any county wide police department," an action that occurred two years ago. That paragraph would also enjoin Camden from participating and joining "in the creation of" a county police department, or in the "regionalization of police services sought to be created" by the establishment of a countywide force, which has already taken place. For more than two years, the Camden Metro Division of

43

the County Police Department has provided police services to the citizens of Camden. The ordinance, in short, no longer reflects reality.

The submission to the voters of this ordinance, as drafted, would undermine the objectives of the Faulkner Act. The voters who signed the Committee's petition did so at a time when the police reorganization was in the planning stage.[11] Nothing in the record suggests that those voters would support a challenge to the police reorganization two years after the fact.

Moreover, the Legislature has determined that "[a]ny public question voted upon at an election shall be presented in simple language that can be easily understood by the voter." N.J.S.A. 19:3-6. In contrast to the ordinance provision upheld in Stop the Pay Hikes Committee v. Town Council of Irvington, 166 N.J. Super. 197, 207, 210 (Law Div.), aff'd o.b., 170 N.J. Super. 393 (App. Div. 1979), which adequately explained to voters the nature of the Faulkner Act challenge at issue, the ordinance

---

[11] This case is distinct from Brundage v. New Jersey Zinc Co., 48 N.J. 450, 463 (1967), in which the defendant corporation "consummat[ed the disputed] merger" with "unseemly haste" two days after the entry of judgment and the filing of the appeal. Here, the implementation of the County Police Department in the City took place almost twelve months after the trial court's entry of judgment, on a long-established schedule set by Camden, the County, and the State. There is no indication in the record that the reorganization was expedited in order to defeat the Committee's appellate rights.

44

before the Court would be impossibly confusing and misleading if placed on the ballot.

Notwithstanding the Committee's contention, the ordinance before this Court may not be rewritten at this late stage. The Faulkner Act clearly envisions that an initiated ordinance appear on the ballot in precisely the same form in which it was proposed, supported by the required signatures and certified by the municipal clerk. See N.J.S.A. 40:69A-191 (stating that if municipal council "shall fail to pass an ordinance requested by an initiative petition in substantially the form requested . . . the municipal clerk shall submit the ordinance to the voters unless" the Committee of Petitioners withdraws it (emphasis added)); N.J.S.A. 40:69A-184; see also In re An Initiative Petition for the Adoption of an Ordinance to Amend the Jackson Twp. Admin. Code, 437 N.J. Super. 203, 216 (App. Div. 2014) (holding that initiative petitions must "reach the voters in substantially the same form as presented to the petitioners"), certif. denied, 221 N.J. 218 (2015). The voters who signed the Committee's petition in 2012 committed their support to the ordinance precisely as it was drafted -- nothing more. See Ordinance to Amend the Jackson Twp. Admin. Code, supra, 437 N.J. Super. at 216-17. Nor can the ordinance be salvaged by an interpretative statement, which is intended to explain the question to voters, not to revise it after the fact. See

45

N.J.S.A. 19:3-6; see also Ordinance to Amend the Jackson Twp. Admin. Code, supra, 437 N.J. Super. at 213, 216-17 (holding that court may not sever clause from initial ordinance and submit remainder of ordinance to voters).

We note that the Committee of Petitioners properly filed a motion to accelerate the appeal, which was denied by the Appellate Division, and the appeal was heard by the Appellate Division in the ordinary course. When a party to a Faulkner Act challenge moves to accelerate an appeal from a decision validating or invalidating an ordinance, an appellate court should ordinarily grant the motion and consider the merits of the appeal on an expedited basis. See R. 2:9-2 (permitting court to accelerate proceedings when a prompt final disposition is required); DeSimone v. Greater Englewood Hous. Corp., 56 N.J. 428, 434 (1970) (stating that accelerated applications should be granted in cases "of great public importance [that] urgently require[] prompt final adjudication"); see also State in Interest of S.T., 233 N.J. Super. 598, 606-07 (App. Div. 1989). Prompt appellate review of a trial court's judgment is important in cases such as this, so that the validity of a proposed ordinance can be determined when the ordinance is still timely, and the initiative and referendum rights recognized by the Legislature in the Faulkner Act may be protected.

In this case, the Committee's challenge to the police reorganization must start anew with an ordinance that reflects the facts as they now stand.[12]

V.

The judgment of the Appellate Division is affirmed in part and reversed in part.  The matter is remanded to the trial court for the entry of judgment directing the Camden Municipal Clerk not to certify the Committee's ordinance pursuant to <u>N.J.S.A.</u> 40:69A-187.


CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion.  JUSTICE FERNANDEZ-VINA did not participate.

---

[12] In light of our ruling, we do not reach the argument, asserted by Mayor Redd, that the ordinance should have been proposed by referendum under <u>N.J.S.A.</u> 40:69A-185, rather than by initiative under <u>N.J.S.A.</u> 40:69A-184.

47

SUPREME COURT OF NEW JERSEY

NO. __A-71/72/73__                    SEPTEMBER TERM 2013

ON CERTIFICATION TO _____Appellate Division, Superior Court_____


HONORABLE DANA L. REDD, Camden City Mayor, and
HONORABLE FRANCISCO MORAN, Camden City Council President,

    Plaintiffs-Appellants
    and Cross-Respondents,

                    v.

VANCE BOWMAN, LARRY GILLIAMS, EULISIS DELGADO,
MARY I. CORTES, and ROBERT DAVIS, Individually and
collectively as the Committee of Petitioners,

    Defendants-Respondents
    and Cross-Appellants,

            and

LUIS PASTORIZA, Clerk of the City of Camden,
JOSEPH RIPA, Clerk of Camden County, PHYLLIS PEARL, Camden County
Superintendent of Elections, CAMDEN COUNTY BOARD OF ELECTIONS,
and CAMDEN COUNTY COUNCIL,

    Defendants.


DECIDED _____August 11, 2015_____

_____Chief Justice Rabner_____ PRESIDING

OPINION BY _____Justice Patterson_____

CONCURRING/DISSENTING OPINIONS BY _____

DISSENTING OPINION BY _____

| CHECKLIST | AFFIRM IN PART/ REVERSE IN PART/ REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | -------------------- | -------------------- |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 6 | |